IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RANDY LANGER and JAMES LANGER, | ) | CIVIL ACTION |
| | ) | |
| Plaintiffs, | ) | No.  2:16-cv-06130-HB |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| CAPITAL ONE AUTO FINANCE, a division of | ) | |
| CAPITAL ONE, N.A., | ) | |
| | ) | |
| Defendant | ) | |

**BRIEF IN SUPPORT OF UNCONTESTED MOTION FOR FINAL
APPROVAL OF SETTLEMENT AGREEMENT, CERTIFICATION OF
SETTLEMENT CLASS, APPROVAL OF ATTORNEY FEES AND COSTS,
ENTRY OF FINAL JUDGMENT, AND DISMISSAL WITH PREJUDICE**

Plaintiffs, by and through their undersigned counsel, Richard Shenkan and Shenkan Injury

Lawyers, LLC. ("Class Counsel"), file this Brief in Support of their Uncontested Motion for Final

Approval Settlement Agreement, Certification of Settlement Class, Approval of Attorney Fees and

Costs, Entry of Final Judgment, and Dismissal with Prejudice (the "Motion"), stating as follows:

## I.   **INTRODUCTION**

This class action was commenced in October of 2016 by Plaintiffs, Randy Langer and

James Langer, individually and on behalf of putative classes of similarly-situated consumers who

had Auto Loans[1] with Defendant, Capital One Auto Finance, a division of Capital One, N.A.

("COAF"). After COAF repossessed Plaintiffs' and the putative class members' motor vehicles,

due to alleged payment defaults on the auto loans, COAF's practice was to send the borrowers and

---

[1]     Capitalized terms not expressly defined herein shall have the meanings ascribed to them in
the Class Action Settlement Agreement and Release ("Agreement") (ECF No. 93-3).

co-borrowers, if any, statutorily prescribed post-repossession notices, hereafter "Post-Repossession Notices," stating certain statutory rights of the debtor(s), including the minimum time period for any redemption. If the vehicle was not redeemed or the account reinstated, COAF would sell the repossessed vehicle at an auction and then send a notice of any surplus or deficiency, hereafter a "Post-Sale Notice."  Plaintiffs asserts that they and the putative class members are entitled to compensatory damages as a result of certain deficits in these notices pursuant to the Pennsylvania Uniform Commercial Code ("UCC"), itself, and/or the UCC and the Motor Vehicle Sales Finance Act ("MVSFA") in *pari materia*.

Because repossession of a motor vehicle effects an immediate seizure of a consumer's property without legal process or any judicial oversight, the UCC requires that the provisions governing the repossession and disposition of a motor vehicle be strictly adhered to and that the repossession and disposition of the vehicles be commercially reasonable. Here, Plaintiffs asserted that COAF did not comply with the requirements of the UCC, itself, and the UCC and MVSFA in *pari materia*, and that this non-compliance rendered their repossession/disposition practices commercially unreasonable under 13 Pa. C.S. §9610, *et seq.*

These defects, if proven, would subject COAF to liability to its consumer borrowers for the greater of statutory or actual damages according to 13 Pa. C.S. § 9625. In addition, Plaintiffs have pled that they and the putative class members are entitled to have their alleged Disputed Deficiency Balances extinguished, have any deficiency judgments vacated, and have the tradelines relating to the Disputed Deficiency Balances removed from their credit files.

COAF has taken the position that its Post-Repossession Notices and Post-Sale Notices were not deficient in any regard and that it has no liability to Plaintiffs or the putative class members for statutory or actual damages, that its conduct was not commercially unreasonable and

that the Disputed Deficiency Balances are valid and enforceable.

## II.  **FACTUAL BACKGROUND**

The fact pattern underlying Plaintiffs' claims is generally the same for Plaintiffs and the Class Members. With respect to Class 1, in each case, COAF, as secured creditor under a consumer loan, repossessed a motor vehicle purchased by one or more Class 1 Members and sent a standard-form Post-Repossession Notice to the Class 1 Member(s) that set forth a minimum redemption period of fewer than 15 days from the date of the mailing of the Post-Repossession Notice. Plaintiffs allege these Post-Repossession Notices did not comply with 12 Pa. C.S. §6254(c)(3), thus violating the UCC, itself, and in *pari materia* with the MVSFA. Plaintiffs' also claim this failure to comply with statutory provisions was commercially unreasonable in violation of the UCC, 13 Pa. C.S. §9610(b). Plaintiffs have asserted that these allegations apply to all Class 1 Members.[2]

With respect to Class 2, after COAF sold the Class 2 Members' repossessed vehicles (when the borrowers did not redeem their vehicles or reinstate their loans) COAF mailed to the primary borrowers, but not separately to the co-borrowers, Post-Sale Notices which informed them, *inter alia*, of the date on which their vehicles were sold, the selling prices, the alleged deficiency balances or surpluses, etc. In Plaintiffs' case, COAF mailed Plaintiff Randy Langer a Post-Sale Notice explaining the calculation of the claimed post-sale deficiency balance for Plaintiffs' Auto Loan, but COAF did not mail a separately addressed notice to the co-borrower, Plaintiff James Langer. Plaintiffs contend that under the UCC, every individual whose vehicle is repossessed and sold is entitled to receive from the secured party a separate Post-Sale Notice informing the

---

[2]     Plaintiffs also made a claim that COAF failed to send separately mailed Notices of Repossession to co-borrowers who shared a mailing address but have since withdrawn that claim.

individual of the results of the sale and the status of the subject auto loan account. *See* 13 Pa. C.S. § 9616. Plaintiffs further contend that, in cases where there are co-borrowers on an auto loan, each of the co-borrowers is statutorily entitled to receive a separately addressed Post-Sale Notice for the deficiency that they would be separately liable for. Plaintiffs contend that by failing to mail a separately addressed Post-Sale Notice to each co-borrower, COAF violated the UCC, giving rise to Plaintiffs' claim for statutory damages. Plaintiffs have asserted that these allegations apply to all Class 2 Members.

## III.   PROCEDURAL BACKGROUND

On October 5, 2016, Plaintiffs filed a Class Action Complaint (the "Complaint") with the Court of Common Pleas for the First Judicial District of Pennsylvania, in an action captioned *Randy Langer and James Langer v. Capital One Auto Finance, a division of Capital One, N.A.*, October Term, 2016, No. 00560. On November 21, 2016, COAF removed the matter to this Court. Thereafter, on November 28, 2016, COAF timely filed an answer to the Complaint. Discovery commenced, during which COAF provided a considerable number of documents and data (more than 17,000 pages) regarding Plaintiffs' and the Class Members' Auto Loans and COAF's policies and procedures. On April 24, 2017, the Parties participated in an all-day private mediation session with mediator Arthur Stroyd. Thereafter, the Parties negotiated in good faith to settle Plaintiffs' claims, including through participation in multiple settlement conferences with United States Magistrate Judge Elizabeth T. Hey, ultimately resulting in the Settlement.

## IV.   NOTICE TO THE CLASS

On May 24, 2019, the Court entered an Order (ECF No. 95) granting Plaintiffs' Uncontested Motion for Preliminary Settlement Approval, Conditional Certification of Settlement Classes, and Approval of Class Settlement Notice. Therein the Court, *inter alia,* set a Hearing for

Final Approval for November 8, 2019 and authorized the mailing of the Class Notice (ECF 95) no later than July 23, 2019.

On July 23, 2019, Class Notices were mailed to a total of 9,820 Class Members.[3]  From the first population, 2,171 of the Class Notices were returned as undeliverable. Subsequent mailings were sent August 9, 12, 20, and October 13 and 17, after updated addresses were obtained. The result is that 9,206 Class Members were mailed Class Notice for which delivery was confirmed. This is a 93.75% delivery rate, which is exceptional. There are only 614 Class Members for which valid addresses have not been identified. Efforts continue to be made to reach these Class Members; however, some Class Members have died or simply do not want to be found.

> *There were __no__ objections to the Settlement itself.*
>
> *There were __no__ opt-outs.*
>
> *And, there were __no__ objections to the equal allocation of the distribution between the co-borrowers.*

The Class Members overwhelmingly support the Settlement. This is evidenced by the fact that no Class Member has objected to the settlement and no Class Member chose to be excluded. The lack of any opposition shows a favorable reaction to the settlement that supports final approval. *In re SmithKline Beecham Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990) ("the reaction of the class to the proffered settlement is perhaps the most significant factor to be weighed in considering its adequacy, particularly when the relief is expressed in monetary terms. … Both the utter absence of objections and the nominal number of shareholders who have exercised their

---

[3]      See Affidavit of William G. Atkinson, attached as __Exhibit 1__.

right to opt out of this litigation militate strongly in favor of approval of the settlement."); *see also,*

*Schlensky v. Dorsey,* 574 F.2d 131, 148 (3d Cir. 1978).

## V. **NATURE OF THE SETTLEMENT**

The Parties have agreed to the terms of a Settlement to resolve the claims of all Class

Members, which provides substantial benefits to them. As set forth and defined in the Agreement,

"Class 1" encompasses 1,790 unique class members (associated with 1,328 auto loan accounts)

who received allegedly deficient Post-Repossession Notices in the period from February 1, 2015

through July 29, 2015,[4] and "Class 2" encompasses 8,030 unique class members (associated with

4,057 auto loan accounts) to whom COAF did not mail a separately-addressed Post-Sale Notice or

to whose co-obligor COAF did not mail a separately-addressed Post-Sale Notice after the sale of

their repossessed vehicle, in the period from October 5, 2010 through June 9, 2017.

The salient points of the Settlement are as follows:

(A)    Payment of $6,500,000 to be used to pay Class Counsel fees and costs; costs of the

Class Notice and administration of the Settlement, and incentive awards.  After payments of these

amounts, 66.7% of the remaining Net Settlement Fund will be allocated to Class 1, and 33.3% to

Class 2. The portion of the Net Settlement Fund allocated will be distributed in equal payments

for each Auto Loan Account, and if there are co-borrowers on an account, the payment will be

spilt equally among the co-borrowers unless they desire a different allocation. COAF has

transferred the settlement funds and they are earning interest at approximately 2%, generating

approximately $10,000 per month.

(B)    Within thirty days after the Effective Date, COAF will transfer the Post-Stay

---

[4]     This is a shortened class period because COAF only sent notices with the alleged
deficiency during a six-month period of time.

Payment Total (the sum of all Post-Stay Payments made by Class Members towards any Disputed Deficiency Balance during the Post-Stay Period of April 24, 2017 – the date of the initial mediation session – through the Effective Date, currently estimated to be approximately $180,000, to the Settlement Fund. Within thirty days of that transfer, the Settlement Administrator shall distribute the Post-Stay Payment Total to Class Members who made Post-Stay Payments, in the amount of the Post-Stay Payments each respective Member made. No attorney fee is charged for the Post-Stay Payments refunds.

(C)     Defendants will extinguish the Disputed Deficiency Balances that remain on their books, and which are reasonably estimated to total $25.4 million. All Class Members will receive this relief except those Class Members who have no current Disputed Deficiency Balance as reflected in COAF's records.

(D)     Within thirty days after the Effective Date, COAF will make a written or electronic request to the three major credit reporting agencies to which they report to delete entirely the tradeline from each Class Members' credit file relating to the Auto Loan Accounts at issue, as further agreed and defined in the Agreement.

(E)     Class 1 Releasors will release COAF in connection with, *inter alia,* all claims related to this lawsuit, the subject Auto Loans (except for Class 1 Releasors who reinstated their accounts), and the Post-Repossession Notices, including any claims they could make as members of the "Public Auction Class" or "Hidden Fees Class" in *Dudo v. Capital One*, 2:19-cv-00098-MRH (W.D. Pa.) ("Dudo"), a separate putative class action against COAF. Class 1 Releasors will not release claims related to Post-Sale Notices unless they are also members of Class 2.

(F)     Class 2 Releasors will release COAF in connection with, *inter alia*, all claims related this lawsuit, the subject Auto Loans, and the Post-Sale Notices. Class 2 Releasors will not

7

release claims related to Notices of Repossession, unless they were also members of Class 1.

(G)     COAF will release Class Members from all claims in connection with, *inter alia*, this lawsuit, the subject Auto Loans (except the Reinstatement Sub-Class Members), and the Disputed Deficiency Balances.

## VI.   LEGAL ARGUMENT

### A.   Final Approval of the Settlement Agreement Should be Granted

This Court has preliminarily determined that class certification appears appropriate for settlement purposes and has preliminarily approved the Agreement. After notice of a proposed class action settlement is sent to the class members, the matter is presented to the Court for final approval. *In re Processed Egg Prods. Antitr. Litig.*, 2014 WL 5149087, *16 (E.D. Pa. Oct. 10, 2014); *See also, Manual for Complex Litigation, Fourth*, § 21.63 (2004). A court should approve a settlement if the settlement "is fair, reasonable, and adequate." Fed. R. Civ. P. 23 (e) (1) (C). *See Ehrheart v. Verizon Wireless*, 609 F.3d 590, 592-93 (3d Cir. 2010). "[A] district court's primary role is to determine whether the settlement is fundamentally fair, reasonable and adequate." *Id. citing In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004).

It is well-established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."). "[A] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.42 (1995). *See also Stanspec Corp. v. Jelco, Inc.*, 464 F.2d 1184, 1187 (10th Cir. 1972) ("The law actively encourages compromise and settlement of disputes.").

8

A district court should not "modify the terms of a voluntary settlement agreement between parties." *Id. citing Evans v. Jeff D.*, 475 U.S. 717, 726-27 (1986). There is a "strong presumption in favor of voluntary settlement agreements" in which the Third Circuit has "explicitly recognized with approval." *Id.* at 594, *citing Pennwalt Corp. v. Plough*, 676 F.2d 77, 79-80 (3d Cir. 1982). This policy is "especially strong" in class actions. *Id.* at 595.

There is "an initial presumption of fairness ... where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (*quoting In re Cendant Corp. Litig.*, 264 F.3d 201, 232 footnote 18 (3d Cir. 2001); *See also, In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 387 (E.D. Pa. 2015) (citing cases). In this Court's May 24, 2019 Order granting preliminary settlement approval, the Court acknowledged that the settlement was the result of arm's length negotiations. (ECF No. 95, p. 3).

Before moving to the *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) factors, Plaintiffs respectfully refer the Court's attention to the Affidavit of Judge Louis C. Bechtle (Ret.) in support of this settlement. **Exhibit 2**. Judge Bechtle (Ret.) opined, in part, as follows:

20.     Class Counsel, a twenty-two year experienced litigator who is experienced in class actions, accepted this case on a contingency basis, funded the litigation, and spent more than a 1,000 hours of time with the prospect of receiving no recovery. His efforts to effectuate this handsome recovery on behalf of these classes is truly exceptional.

21.     In my experience, this is an extraordinary result for the class and the fee sought is far less than many counsel fees that have been approved by the courts in similar class actions. It is my professional opinion that the counsel fees are "reasonable", as required by Fed.R.Civ.P. 23(h) and pursuant to the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975). Significantly, no class member objected to this proposed fee amount. *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, *4 (E.D. Pa. Jan. 3, 2008)("A lack of objections demonstrate that the Class views the settlement as a success and finds

the request for counsel fees to be reasonable.").

22.    In summary, considering the documents I have reviewed and the circumstances of this complicated class action litigation and complex settlement, it is my opinion that the proposed settlement, including the counsel fees, is fair and reasonable and represents an exceptional result for the class members.

In *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), the Third Circuit set forth the following specific factors that a court should consider in determining whether a settlement is fair, reasonable, and adequate:

1.   the complexity, expense and likely duration of the litigation;
2.   the reaction of the class to the settlement;
3.   the stage of the proceedings and the amount of discovery completed;
4.   the risks of establishing liability;
5.   the risks of establishing damages;
6.   the risk of maintaining the class action through the trial;
7.   the ability of the defendants to withstand a greater judgment;
8.   the range of reasonableness of the settlement fund in light of the best possible recovery; and
9.   the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*See In re NFL Players,* 307 F.R.D. at 388 (citing *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir. 1975)). New Federal Rule 23 (e)(2), which went into effect December 1, 2018, enumerates similar factors.

After *Girsh,* the Third Circuit has suggested additional factors to consider, whether: (a) the pleadings, settlement negotiations, and the class certification motion have developed the underlying substantive issues such that all parties may assess the merits of the claims and defenses; (b) members of the Class have had a sufficient opportunity to opt out of the settlement; (c) the awards to the Representative Plaintiffs are fair, adequate and reasonable; and (d) the procedures for processing the individual claims under the settlement are fair and reasonable. *In re Prudential*

*Sales Prac. Litig.,* 148 F.3d 283, 323 (3d Cir. 1998); *In re NFL Players,* 307 F.R.D. at 395-96. An evaluation of the relevant factors demonstrates that the settlement here fits well within the range of reasonableness and should be approved.

### 1.   The Complexity, Expense and Likely Duration of the Litigation

"The first factor captures the probable costs, in both time and money, of continued litigation." *In re NFL Players,* 821 F.3d at 437. This case presented complex and novel issues of law. Should this case continue, the parties would be required to expend significant resources in terms of both time and money to complete discovery, engage in contested motion practice (including class certification motion and briefing as well as dispositive motions and briefing as to liability and damages recoverable under the UCC), and to prepare for and conduct the trial of this matter. Additionally, with millions of dollars at stake, it is likely that one or both parties would seek appellate review of the decisions on the contested motions and/or the result of the trial. Avoidance of this unnecessary expenditure of time and money benefits all parties and should be encouraged. *See In Re Gen. Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 812 (3d Cir. 1995) (concluding that lengthy discovery and ardent opposition from the defendant were facts favoring settlement, which offers immediate benefits and avoids delay and expense); *African v. Verizon Wireless,* 609 F.3d 590, 594-95 (3d Cir. 2010) ("strong presumption in favor of voluntary [class] settlements"). Early settlement of this action provides Class Members with an immediate cash benefit and the extinguishment of the Class Members' Disputed Deficiency Balances, as well as substantial non-monetary benefits, including requests to the Credit Reporting Agencies to delete the credit trade lines associated with the Class Members' Auto Loans. Significantly, the UCC makes no specific express provision for credit repair, and the legal basis for the extinguishment of the Disputed Deficiency Balances is not beyond challenge. The proposed Settlement avoids

11

potential risk with respect to these legal determinations. Moreover, the time value of money and

certainty of a settlement weigh in favor of granting final approval of the Settlement.

### 2.   The Reaction of the Class to the Settlement

The reaction of the Classes to the Settlement has been outstanding. There have been no

objections nor no opt-out requests received or filed.  The Class Members had sufficient opportunity

to do so, as they were given 45 days from the date of the Class Notice to object to or opt out of the

Settlement.

### 3.   The stage of the proceedings and the amount of discovery completed

The named Plaintiffs filed their Complaint in the Court of Common Pleas of Philadelphia

County on October 5, 2016. The case was then removed to this Court in November 2016. (ECF

No. 1). While the parties agreed to explore an early resolution of this case, the Settlement in this

matter was not reached until after approximately 2½ years of vigorous and heavily contested

litigation, and a series of mediations and settlement conferences with the aid of a private mediator

and Magistrate Judge Elizabeth Hey.

For a settlement to be approved, the parties must have an "adequate appreciation" of the

merits of the case. *In re Warfarin*, 391 F.3d at 537 (*quoting In re Cendant*, 264 F.3d at 235)); *See*

*also, In re Prudential Sales Prac. Litig.*, 148 F.3d at 319. Courts have recognized that in some

cases, even informal discovery can be enough for class counsel to assess the value of the class'

claims and negotiate a settlement that provides fair compensation. *See In re NFL Players*, 821 F.3d

at 436-437, 439 ("What matters is not the amount or type of discovery class counsel pursued, but

whether they had developed enough information about the case to appreciate sufficiently the value

of the claims."); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 267 (E.D. Pa. 2012)

(presumption of fairness would apply "although no formal discovery was conducted" because

12

"[class counsel] conducted informal discovery, including, *inter alia,* independently investigating the merits").

Here, the parties engaged in both informal and formal discovery resulting in the production of over 17,000 pages of documents by COAF and the discovery of other claims that, as noted above, resulted in the filing of a separate case that is carved-out of the Settlement of this matter (*Dudo, supra,* currently pending in the Western District of Pennsylvania). As a result of the efforts litigating and mediating this matter, the Plaintiffs' counsel obtained sufficient information as to COAF's subject practices, as well as statutory damages information, to enable Plaintiffs to evaluate their respective positions and negotiate a settlement that takes into consideration the costs and risks of continuing with the litigation. At the time of settlement in April of 2019, the case had reached a ripe stage where "the parties certainly [had] a clear view of the strengths and weaknesses of their cases" and the relevant issues. *Reibstein v. Rite Aid Corp.,* 761 F.Supp.2d 241, 252 (E.D. Pa. 2011); *McCoy v. Health Net, Inc.,* 569 F. Supp. 2d 448, 461 (D.N.J. 2008).

### 4. The risks of establishing liability and the risks of establishing damages

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential Insurance Co.,* 148 F.3d 283, 319 (3d Cir. 1998). As with any litigation, there are risks attendant to a decision to forgo a possible settlement. While Plaintiffs submit that they have a strong case, a liability determination is not a foregone conclusion and COAF has vigorously disputed Plaintiffs' claims on a number of grounds.

Additionally, while the statutory damages sought under 13 Pa. C.S. §§9625(c)(2) and 9625(e)(5) would be straightforward and easy to calculate for Plaintiffs and the Class Members, the additional remedies requested by Plaintiffs – including the requests for deletion of the credit

trade lines, the vacating of deficiency judgments, and the return of Post-Stay Payments – while well-founded in Plaintiffs' view in light of 13 Pa. C.S. 9625(a), have yet to be the subject of any controlling UCC precedent in Pennsylvania.

Plaintiffs believe that the disputed Deficiency Balances of Plaintiffs and Class Members should be extinguished if the Court were to determine that COAF's Post-Repossession Notices did not comply with 13 Pa. C.S. § 9614. Defendant, however, has indicated that it would pursue counterclaims seeking set-off and recoupment if the class is certified, and if successful, the Class Members could receive substantially less than they stand to receive from the settlement or could be left still owing COAF on their deficiency balances. Accordingly, this factor strongly favors final approval of the Settlement.

### 5.   The risk of maintaining the class action through the trial

This Court made a preliminary determination on class certification for purposes of preliminary approval (ECF No. 95). Plaintiffs believe each of the elements for class certification under Rule 23 are readily met here, that the Classes could have been certified even if contested, and that the Classes should be finally certified here for settlement. However, COAF had previously indicated that it would challenge the certifiability of this class action based on its position that many of the issues in this case would require extensive individualized discovery with regard to the particular facts and circumstances of each Class Member's repossession, sale, and related interactions with COAF that would necessitate multiple mini-trials as to the reasonableness of the notices at issue, and that individualized questions of fact also predominate with regard to whether COAF complied with the post-sale notice requirements under Section 9616 of the UCC. Settlement eliminates the need to litigate these issues which could potentially pose a threat to class certification. While Plaintiffs believe they have the better of these arguments, this *Girsh* factor favors approval

14

of the Settlement because it avoids the potential risk of failing to obtain initial class certification and failing to maintain same through trial.

### 6.   The ability of the defendants to withstand a greater judgment

As noted, this settlement will result in: (1) a cash payment by COAF of $6,500,000; (2) return of approximately $180,000 in Post-Stay Payments paid by some Class Members toward a Disputed Deficiency Balance made after the April 24, 2017 mediation; (3) a request by COAF to the three major credit reporting agencies to delete the trade lines associated with Plaintiffs' and the Class Members' auto loans with COAF; and, (4) the extinguishment of the disputed Deficiency Balances totaling more than $25.4 million and vacating any deficiency judgments already obtained. While COAF could certainly withstand a greater damages figure, the elimination of the deficiency balances/judgments and the effect of the credit repair — which might not be available through a trial – means that a "greater" damages number may not render a greater net benefit to the putative Class Members. *See Cosgrove,* 2011 WL 3740809 at \*8 (noting the uncertainty of awarding deficiency cancellation and credit report relief at trial).

The Eastern District has recognized:

> This factor assesses the ability of defendants to withstand a greater judgment, and is "most clearly relevant where a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." *Reibstein v. Rite Aid Corp.,* 761 F.Supp.2d 241, 254 (E.D.Pa.2011). However, when there is no "reason to believe that [d]efendants face any financial instability[,] ... this factor is largely irrelevant." *Id.;*
>
> *In re Nat. Football League Players' Concussion Injury Litig., 307 F.R.D. 351, 394 (E.D. Pa. 2015), amended sub nom. In re Nat'l Football League Players' Concussion Injury Litig., No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and aff'd sub nom. In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410 (3d Cir. 2016), as amended (May 2, 2016)*

15

The Third Circuit concurred, stating:

> [I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the ... settlement. *Sullivan*, 667 F.3d at 323 (quoting *Weber v. Gov't Empl. Ins. Co.*, 262 F.R.D. 431, 447 (D.N.J.2009)).
>
> *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 440 (3d Cir. 2016), *as amended* (May 2, 2016)

Thus, Plaintiffs submit that this factor is neutral.

> **7.  The range of reasonableness of the settlement fund in light of the best possible recovery and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation**

As the Third Circuit has explained:

> In evaluating the eighth and ninth *Girsh* factors, we ask whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial.

*In re NFL Players,* 821 F.3d at 440 (internal citations and quotations omitted). An assessment of the reasonableness of a proposed settlement requires analysis of the present value of the damages a plaintiff would likely recover if successful, appropriately discounted for the risk of not prevailing. *In re Prudential*, supra, at 322. "[I]n conducting the analysis, the Court must guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Wallace v. Powell*, 288 F.R.D. 347, 370-71 (M.D. Pa. 2012) (quoting *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 324 (3d Cir. 2011)).

The best possible verdict in this case is comprised of two elements. The first is an affirmative recovery of $16.1 million of UCC statutory damages for Class 1 and $4.0 million for

Class 2,[5] plus $25.4 million of deficiency balances extinguished, for a possible maximum recovery of $45.5 million.[6] However, Defendant has stated that it would claim a setoff and recoupment consisting of the aggregate of all of the disputed deficiency claims across the Class which would be approximately $25.4 million. The second element of the "best result" would be to defeat these putative set-off defenses and counterclaims. Accordingly, the total value of the "best result" for both classes combined is $45.5 million. This unique Settlement provides for **_70.5% of the total recoverable potential financial benefit_** conferred as it includes, *inter alia*, (1) an affirmative cash recovery of $6.5 million (66.7% of this to Class 1 ($4,335,500), and 33.3% to Class 2 ($2,164,500)); (2) the extinguishment of the disputed Deficiency Balances totaling approximately $25.4 million; and (3) the return of Post-Stay Payments totaling approximately $180,000. This makes the total value of the Settlement (not including the valuable credit repair and the vacating of any deficiency judgments) approximately $32.1 million. This settlement figure is an <u>exceptional</u> settlement for both Classes.

Looking at this result on an individual class member/account basis, the Settlement provides substantial monetary relief to the Class Members. The gross settlement amount of $4,335,500 allocated to the 1,328 auto loan accounts in Class 1, yields a gross settlement amount of $3,265 for each Auto Loan in that class. This figure represents approximately 27% of the Class 1 Members' statutory damages of $12,113 per-account average for 13 Pa. C.S. §9625(c)(2) statutory

---

[5]      Class 2 Members, who are not members of Class 1 and are putative class members in *Dudo, supra*, may also have the opportunity to pursue additional relief through the *Dudo* litigation.

[6]      While Plaintiffs sought the greater of actual or minimum statutory damages pursuant to 13 Pa. C.S. § 9625, the determination of actual damages would require significant additional discovery which would result in considerable delay, may not yield an appreciable increase in the damages and would jeopardize this excellent Settlement.

damages for Class 1).[7] The gross settlement amount of $2,164,500 allocated to Class 2, which yields a gross settlement amount of approximately $270 for each Class 2 Member, represents approximately 54% of the Class 2 Members' claimed statutory damages (applying $500 per violation in statutory damages pursuant to 13 Pa. C.S. 9625(e) for each borrower). In addition to this financial recovery, COAF has agreed to return the Class Members' Post-Stay Payments of approximately $180,000 and vacate any deficiency judgements.

Moreover, the Settlement includes significant benefits which, while incredibly substantial, are difficult to measure such as the total expungement of *all* references to the subject Auto Loans (including any default and repossession notation) by all three major credit bureaus for *all* Class Members' credit files (even those Class Members who reinstated their account and are still paying on their Auto Loan).[8]

The tradeline deletion will likely improve the credit rating of the Class Members, potentially resulting in a much more favorable cost of credit in the future. *Maszgay*, Final Approval Order, p. 4. **Exhibit 3**. It removes a significant negative influence on loan, insurance, mortgage or even employment decisions. *Id.*, citing Lea Shepard, *Seeking Solutions to Financial History Discrimination*, 46 Conn. L. Rev. 993, (2014). In *Ciccarone v. B.J. Marchese, Inc.*, 2004 WL 2966932 at *10 (E.D. Pa. Dec. 22, 2004), the court estimated that the value of the credit repair was equal to the cash component of the settlement. *See also, Cosgrove v. Citizens Auto Fin., Inc.*, 2011 WL 3740809, at *7 (E.D. Pa. Aug. 25, 2011) ("additional obligation to correct negative entries on

---

[7]     Based on verified spreadsheets and analytics, the data of which COAF provided pursuant to discovery and settlement purposes.

[8]     The Reinstatement Sub-Class Members' settlement payments will be credited to their Auto Loan Accounts, as opposed to being paid by checks issued directly to the Reinstatement Sub-Class Members.

class members' credit reports is tangible and adds value to the settlement"). *Id.*

This case has certain litigation risks, the early avoidance of which makes this Settlement extremely advantageous to the Class. These risks included, for example: (1) the risk of not having the Court preliminarily certify this Class or not maintaining certification through the case; (2) the risk of not receiving the equitable relief such as the removal of the tradeline or the extinguishment of over $25.4 million in deficiency balances; (3) the risk of not having COAF return approximately $180,000 of Post-Stay Payments; (4) the risk of not having COAF vacate any deficiency judgements; and, (5) the risk (albeit unlikely) of a jury finding cash damages at less than the amount negotiated (e.g., not awarding the expungement of the credit repair and/or the compromise of the Disputed Deficiency) or finding no liability at all.

The proposed monetary relief in the Settlement is well within the range (as a proportion of minimum statutory damages) of settlements in other UCC repossession-related class actions. This case is not a class action involving clear-cut UCC violations in which there is controlling precedent. Rather, this case posits, *inter alia*, questions such as whether a violation of the MVSFA, when read in *pari materia* with the UCC, renders a Notice of Repossession *per se* commercially unreasonable under the UCC and whether the UCC requires the secured creditor to send a separate, separately addressed Post-Sale Notice to each co-borrower. While Plaintiffs believe that they have very strong arguments, these legal theories are, to a large extent, untested because there is no controlling precedent addressing each of these unique facts.

Class Counsel enthusiastically endorses this Settlement because it is extremely favorable to the Classes. Class Counsel has spoken with numerous class members as part of the administration process, each of whom support this settlement and would like to obtain the relief as quickly as possible. The need for the settlement is underscored by the dozens of class members

with whom Class Counsel has conferred, who have expressed considerable sufferings as a result of the damage to their credit occasioned by the repossession. The opinion of experienced Class Counsel that settlement is in the best interest of the Classes is entitled to "significant weight." *Wallace v. Powell*, 2015 WL 9268445, at *14 (M.D. Pa. Dec. 21, 2015) ("When the settlement results from arms-length negotiations, the court will afford considerable weight to the views of experienced counsel regarding the merits of the settlement.") (citations omitted); accord *Lake v. First Nationwide Bank*, 900 F.Supp. 726, 732 (E.D. Pa. 1995) (endorsement by experienced counsel is entitled to "significant weight").

In conclusion, the factors discussed above weigh heavily in favor of final approval of the proposed Settlement.

## B. Representative Plaintiff Service Awards and *Cy Pres*

The Agreement provides that each of the Representative Plaintiffs will receive an Incentive Award not to exceed $15,000. This is well within the range of service awards that are granted in similar class actions of this magnitude and level of complexity. *See e.g., Craig v. Rite Aid Corp.*, 2013 WL 84928, at *13 (M.D. Pa. Jan. 7, 2013) (awards $5,000-$7,500 in Fair Labor Standards Act case). An award of this magnitude is fully justified by the involvement of these individuals in the litigation, including the Plaintiffs' significant time loss from work for their attendance at out-of-town mediations and settlement conferences, multiple phone calls with counsel, deposition preparation, and review of documents.

> Depending on the involvement of the class representative, courts, including federal courts sitting in Pennsylvania, have allowed incentive awards in substantial amounts. *See, e.g., In re SmithKline Beckman Corp. Sec. Litig.*, 751 F.Supp. 525 (E.D.Pa. 1990) (approving award of $5,000 to each of several class representative); *In re First Jersey Sec., Inc. Litig.*, MDL No. 681, 1989 WL 69901 (E.D. Pa. June 23, 1989) (approving award of $24,000 to class representative); *Bogosian v. Gulf Oil Corp.*, 621 F.Supp. 27 (E.D.Pa.1985) (approving award of $20,000 to each of two class representatives).

20

*Milkman v. American Travelers Life Insurance Company*, 2002 WL 778272, at *30 (C.C.P. Phila. Co. April 1, 2002)(service awards approved for $10,000, $7,500, and $5,000). See also, *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998) (affirming $25,000 incentive award to class representative because "a named plaintiff is an essential ingredient of any class action, [and] an incentive award is appropriate if it is necessary to induce an individual to participate in the suit"); *In re Dun & Bradstreet Credit Services Customer Litigation*, 130 F.R.D. 366, 367 (S.D. Ohio 1990) (approving two incentive awards of $55,000 and three of $35,000 to five representatives).

The Agreement also provides that in the event there are any uncashed distribution checks, those amounts are to be distributed to Cy Pres Recipients, all 501(c)(3) nonprofit organizations such as – the National Association of Consumer Advocates, the National Consumer Law Center, and the University of Pittsburg (for its Law School Taxpayer Clinic). (*See* Agreement, para. 2.29). All of these institutions are worthy charitable beneficiaries.

### C. The Class Should be Certified

Plaintiffs' argument for class certification was set forth at length in Plaintiffs' Memorandum of Law in Support of Their Uncontested Motion for Preliminary Settlement Approval and they will not repeat that argument here. They will, however, incorporate that argument herein, and believe that it demonstrates that the class certification requirements of Fed. R. Civ. P. Rule 23 have been clearly satisfied.

The only new factor to be addressed is the response of the Class to the Class Notice. As there were no objections and no opt-outs by any of the approximately 10,000 Class Members, the response by the Classes can only be deemed excellent. This, of course, supports the grant of certification for purposes of implementing the instant Settlement. Plaintiffs incorporate their arguments in support of class certification made at preliminary approval, where each of the Rule

21

23(a) and 23(b)(3) elements was addressed, supplementing the record with the overwhelmingly positive (by silence) response of the Classes to the terms of the settlement as set forth in the Class Notice.

### D. **Class Counsel Fees are Reasonable and Should Be Approved**

  1. The Equitable Foundation for Award of Attorneys' Fees in Representative Actions

The United States Supreme Court has long held that one who successfully pursues a lawsuit that creates a common fund is entitled to reasonable compensation from the fund as a whole. *Trustees v. Greenough*, 105 U.S. 527 (1882). *See also, Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "The underlying justification for attorney reimbursement from a common fund, as explained by the Supreme Court in three early cases, is that unless the costs of litigation are spread to the beneficiaries of the fund, they will be unjustly enriched by the attorney's efforts." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993) *(citing* cases). The Third Circuit is in accord. *In re General Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995); *In re Cendant Corp.*, 264 F.3d 201, 256-57 (3d Cir. 2001). The financial inducements offered by the class action procedure have played an important role "in vindicating the rights of individuals who might otherwise not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338 (1980).

The importance of contingent fee-based litigation is particularly evident in the context of consumer protection cases such as this one. The Courts have consistently recognized the value of private litigation as a necessary and desirable tool to assure the effective enforcement of the consumer protection, securities, and antitrust laws. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 781 (3d Cir. 2009); *See*

*also Perry*, 229 F.R.D. at 123 (many consumer claims would be ignored but for the consumer class action.)

> 2. Plaintiffs' Fee Request from the Common Fund is Fair and Reasonable and In Line with Awards Approved in Similar Cases

"In common fund cases such as this one, the percentage-of-recovery method is generally favored because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure," *In re AT&T Corp.,* 455 F.3d 160, 164 (3d Cir. 2006), quoting *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 300 (3d Cir. 2005); *accord, In re Cendant Corp. Prides Litig.,* 243 F.3d 722, 734 (3d Cir. 2001) ("The percentage-of-recovery method has long been used in this Circuit in common-fund cases."); *See, also Cullen v. Whitman Medical Corporation*, 197 F.R.D. 136, 147 (E.D. Pa. 2000) ("Because this case is a common fund case, I find that the percentage of-recovery method provides a more appropriate basis for evaluating counsel's fee petition."). The "percentage of recovery approach is usually appropriate where the efforts of counsel have generated a "common fund" from which the class and counsel are to be compensated." *Ciccarone,* 2004 WL 2966932 at *3, *citing In re General Motors,* 55 F.3d at 821. The U.S. Supreme Court has noted that in settlement fund cases, such as this one, "a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson,* 465 U.S. 886, 900 n.16 (1984).

Attorneys' fees equal to one-third of the benefit obtained on behalf of the class is within the approved range in class actions. *Grier v. Chase Manhattan Automotive Finance Co.*, 2000 U.S. Dist. LEXIS 1339 (E.D. Pa.) (awarding fees of 33 1/3 % of settlement fund, noting that because common fund is relatively small, it is appropriate to award a higher percentage than in cases resulting in substantially larger funds); *In Re Greenwich Pharm. Sec. Lit.*, 1995 U.S. Dist. LEXIS 5717 (E.D. Pa. 1995) (on settlement of $4.375 million, court approves fee of 33 % as appropriate,

noting in this "much smaller case," a fee award of 33% does not present the danger of providing

plaintiff's counsel with the windfall that would accompany a 'megafund' of, for example, $100

million.); *Sala v. Nat'l R.R. Passenger Corp.*, 128 F.R.D. 210 (E.D. Pa. 1989) (On settlement of

$179 million, court awards 33% fee on first million and 30% on the remainder); *Taubenfeld v. Aon

Corp.*, 415 F.3d 597 (7th Cir. 2005) (approving award of fees equal to 30% of $7.25 million

settlement plus $111,054.06 in expenses and citing with approval a submission showing thirteen

cases in the Northern District with awards of 30-39% of common funds in class actions); *Gaskill

v. Gordon*, 160 F.3d 361 (7th Cir. 1998) (awarding 38% of the fund as fees). *See also* ALBA CONTE

& HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS, § 13:80 (4th ed. Updated June 2008).

      The Third Circuit Court of Appeals has explained that "[t]he percentage-of-recovery

method is generally favored in common fund cases because it allows courts to award fees from the

fund 'in a manner that rewards counsel for success and penalizes it for failure.'" *In re Rite Aid

Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) (quoting *In re Prudential Ins. Co. America

Sales Litig.*, 148 F.3d 283, 312 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999). Courts have

long recognized that the attorneys' contingent risk is an important factor in determining the fee

award. *See Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 565 (7th Cir. 1994); *Gaskill*, 160

F.3d at 363.

      It is well-settled that the attorneys who create a benefit for class members are entitled to

compensation for their services. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980); *Morris B.

Chapman & Assoc. v. Kitzman*, 193 Ill. 2d 560, 572-73 (2000). "When a class suit produces a fund

for the class, it is commonplace to award the lawyers for the class a percentage of the fund."

*Gaskill*, 160 F.3d at 363 (7th Cir. 1998) (affirming award of 38% of $20 million), and citing *Blum

v. Stenson*, 465 U.S. 886, 900 n.16 (1984). The U.S. Supreme Court has noted that in settlement

fund cases, such as this one, "a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984).

Here, Class Counsel is asking for only *6.7%*[9] of the gross benefit to the class (see below) despite the Eastern District of Pennsylvania and other federal courts routinely awarding attorneys' fees equal to one-third of the benefit obtained on behalf of the class. *Sala v. Nat'l R.R. Passenger Corp.*, 128 F.R.D. 210 (E.D. Pa. 1989) (On settlement of $179 million, court awards 33% fee on first million and 30% on the remainder); *Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005) (approving award of fees equal to 30% of $7.25 million settlement plus $111,054.06 in expenses and citing with approval a submission showing thirteen cases in the Northern District with awards of 30-39% of common funds in class actions); *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) (awarding 38% of the fund as fees). *See also,* Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*, § 13:80 (4th ed. Updated June 2008).

Indeed, in *Maszgay*, a similar post-repossession disclosure notice class action which Class Counsel settled and sought a fee of 17% of the $17 million benefit conferred (cash and extinguished disputed deficiency balances), the Court explained: "an attorney fee of one-third of the total recovery would also be a reasonable fee in light of the risk and considerable benefit conferred in this case." **Exhibit 3**, p. 6.  Class Counsel believes that the fee sought is extremely reasonable in light of the outstanding recovery and persistent efforts over the years of this litigation.

In *Gunter v. Ridgewood Energy Corp.,* the Third Circuit set forth the factors for the district court's fee-award consideration, 223 F.3d 190, 195 (3d Cir. 2000) (overturning a decision that

---

[9]     This figure includes the cash, compromised Deficiency Balances, and the credit repair as an amount equal to the cash portion of the settlement.

reduced to 18% a requested fee of 25% of the recovered fund). Notably, the *Gunter* factors "need not be applied in a formulaic way because each case is different, and in certain cases, one factor may outweigh the rest." *Wallace*, 2015 WL 9268445, *17.

The *Gunter* factors include (a) size of the fund created and number of persons benefiting from the settlement; (b) presence/absence of substantial objections to the fee; (c) skill of plaintiffs' counsel; (d) complexity and duration of the litigation; (e) risk of nonpayment; (f) amount of time devoted to the litigation; and (g) awards in similar cases. *Gunter*, 223 F.3d at 195. As described below, analysis of the *Gunter* factors supports the requested fee of $2.6 million, plus reimbursement of litigation expenses to date of $49,011.81. [10]

<ol type="a">
<li>The size and nature of the common fund created, and the number of persons benefited</li>
</ol>

The most concise measure of the results achieved in this settlement is the percentage of the best possible recovery that it attains. Even without considering the benefit of the credit repair, the recovery for the class reflected in the present settlement is 70.5% of the potential recovery, yielding a benefit of $32.1 million for the putative class members of almost 10,000 people. Indeed, 100% of the Disputed Deficiency Balances are being compromised by this settlement. This compares extremely favorably with the result in other cases. *See, e. g. McDonough, v. Toys "R" Us, Inc.,* 80 F.Supp.3d 626 (E.D. Pa. 2015)(settlement amount represented approximately 24% of estimated actual damages); *Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company)*, 513 F.Supp.2d 322 (E.D. Pa. 2007)(settlement consideration approximately 18.5% of best possible recovery); *Cullen v. Whitman Medical Corporation*, 197 F.R.D. 136 (E.D. Pa. 2000)(settlement represented approximately 17% of class damages); *In re*

---

[10]   The attached proposed order, **Exhibit 4** to this Brief, is intended to replace the order attached to the motion as the cost amount was mistakenly stated in the motion.

*Ikon Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166 (E.D. Pa. 2000) (settlement provided recovery of 8.7% of best possible recovery).

In *Maszgay v. First Commonwealth Bank*, 686-2015 (Jefferson Co.), a similar class action with claims based on deficient post-repossession notices and with similar relief provided via settlement, the court approved attorney's fees representing 17.4% of the combined value of the cash payments and the amount of disputed deficiency balances that were extinguished (not taking into account the return of post-stay deficiency payments, credit report repair, or the vacating of deficiency judgments), stating:

> [T]he fee agreement between counsel and each of the Representative Plaintiffs provides for a fee equal to forty percent of the total benefit conferred upon the class. Following this calculus to the cash and debt extinguishment portion of the settlement, **an attorney fee of one-third of the total recovery would be a reasonable fee in light of the risk and considerable benefit conferred in this case.** *See; Cullen v. Whitman Medical Corporation*, 197 F.R.D. 136 (E.D. Pa. 2000) (a fee for the forgiveness of debt is compensable and can be included in a common fund recovery). [emphasis added]

In addition to the common fund of $6.5 million and $25.4 million in debt forgiveness, there is also a very valuable credit report correction. As noted, in *Ciccarone*, 2004 WL 2966932, the Court considered the value of a very similar provision in a class settlement for credit report correction. Having considered several approaches, Judge Shapiro concluded that "the most straightforward method for estimating the value of the equitable relief is to have it equal the value of the monetary relief [the cash component]." *Id.* at *10. Judge Foradora adopted this measure, citing this authority, in approving the *Maszgay* class action. See **Exhibit 3**.

By this measure – admittedly imprecise but found reasonable – the aggregate value of the settlement would be approximately $38.6 million ($6.5 cash + $6.5 credit reparation + $25.4 debt forgiveness + $180,000 Post-Stay Payment Return). By this benchmark, *the Class Counsel fees requested represent approximately __only 6.7%__ of the aggregate gross benefit conferred*. If fees

and costs are approved as requested, each Class 1 Class Member stands to receive a check of approximately $1,867 per subject auto loan, with Co-Borrowers splitting that amount, while each Class 2 Member (some of whom are also Class 1 Members) would receive a check of approximately $154. The strong numbers here weigh heavily in favor of granting the fee request. *See In re AT&T*, 455 F.3d at 179 (holding that the trial court properly concluded that the settlement was an "excellent" result in light of the risks).

   b.   The absence of objections to the request for fees supports approval

The second factor focuses on the reaction of the Class to the requested attorney fees. The "absence of large numbers of objections mitigates against reducing fee awards." *Perry*, 229 F.R.D. at 123-24; *In re Diet Drugs Prod. Liab. Litig.*, 553 F. Supp. 2d 442, 473 (E.D. Pa. 2008) (dearth of objections "signifies that the requested award has been viewed by interested parties to this action as fair"); See *also, In re Rite Aid*, 396 F.3d at 305 (affirming district court's finding that the filing of but two objections weighed in favor of awarding fee).

The Class Notice stated that Class Counsel would apply for an award of fees out of the settlement proceeds of up to $2.6 million plus up to $150,000 in expenses (including settlement administration costs). (ECF 93-3, p. 10). Again, there were no objections nor opt-out requests. The lack of any objection to fees or costs also favors settlement approval.

   c.   The Skills and Efficiency of Class Counsel

The "single clearest factor reflecting the quality of Class Counsels' services to the Class are the results obtained." *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 104 (E.D. Pa. 2013). The skill and efficiency of Plaintiffs' counsel is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the

performance and quality of opposing counsel." *In re Ikon, supra*, at 194. The goal under our Circuit's precedent is to ensure "that competent counsel continue to undertake risky, complex and novel litigation" for the benefit of large numbers of class members who might otherwise lack reasonable access to justice. *Gunter*, 223 F.3d at 198.

In the present case, Class Counsel is experienced in complex class action litigation.[11] He has negotiated a significant settlement for the Classes here in a case with many moving and complicated parts, including very complex tax issues relating to the extinguishment of the $25.4 million in Disputed Deficiency Balances via an accord and satisfaction. Class Counsel has obtained a very substantial and definite monetary benefit for almost 10,000 Pennsylvania consumers as efficiently as possible. Class Counsel stewarded this class action to a successful resolution despite COAF's significant defenses and experienced trial counsel. In the absence of this litigation, most of the Class Members likely would not have known of the existence of their legal claim, would have likely lacked any reasonable access to legal representation to pursue their modest statutory claims under the UCC, or the wherewithal to defend any potential deficiency action.

---

[11]     Affiant's class actions include several certified post-repossession consumer disclosure notice class actions for alleged defects, such as *Masgay, et al., v. First Commonwealth Bank*, 686-2015 (Jefferson County 2015)($16.8M benefit conferred), *Antonik, et al., v. First National Community Bancorp, et al.*, 13-4438 (Lackawanna County 2017)($2.8M benefit conferred), and *Cooley, et al., v. F.N.B. Corporation, et al.*, 10010 (Lawrence County 2003)($14M benefit conferred). Additionally, Affiant has served as co-counsel in *Vallies v. Sky Bank*, 01-1438 (W.D Pa. 2001), a certified consumer class action involving Truth in Lending Act claims; *Perod v. McKenzie Check Advance of Pennsylvania, LLC.*, 98-CV-6787 (E.D. Pa. 1998)(a certified consumer class action that resulted in a $4.3M settlement); and in several TCPA certified class actions including *Lyngaas v. Curaden*, 17-CV-10910 (E.D. MI 2017)(certification contested; trial); *Sobol v. Imprimis Pharmaceuticals, Inc.*, 16-CV 14339 (E.D. MI); *Mauthe v. Versa Cardio*, 5:16-CV-00570 (E.D. Pa. 2018); *Conner v. Optum360*, 17-CV-1642 (E.D. Pa. 2019); *Conner v. Carepoint Medical Solutions, LLC.*, 2:16-CV-01436 (2016).

Class Counsel has considerable experience litigating consumer class actions such as this one, most recently having approved a post-repossession disclosure notice class action in which the total benefit conferred was approximately $17M for 2,700 consumers. *Maszgay*, **Exhibit 3**. In connection with Maszgay, Judge John Foradora explained Attorney Shenkan's qualifications as follows:

> In short, Plaintiffs' counsel, Richard Shenkan, is a well-qualified litigator with over 20 years experience and has served as class counsel in other consumer class cases throughout Pennsylvania. ... This case presented novel, complex issues and Class Counsel effectuated an excellent recovery for the Class through his perseverance and skill.

Class Counsel's experience and skill are also evident in the very effective and efficient prosecution of the claims, including the substantial settlement, against well-matched, well-financed opponents. *See In re Ikon Office Solutions, Inc., Sec. Litig., supra.* at 194 (E.D. Pa. 2000) (recognizing as a "significant factor" the "quality of representation").

      d.   The complexity and duration of the litigation

Complexity and duration of the litigation is another factor the Court considers in analyzing Class Counsel fees. *See In re General Motors,* 55 F.3d at 821. By almost any standard, this was very complex litigation. Because this was a class action, it necessarily involved an additional array of substantive and procedural issues related to class certification as an overlay to the underlying substantive legal issues. This matter involved difficult issues of statutory interpretation dealing with the interaction of the Pennsylvania Uniform Commercial Code and the Motor Vehicle Sales Finance Act. Further complicating this case, were the income tax issues relating to any settlement or award received by Plaintiffs and class members, as well as the *Dudo* case, which involved another deficiency in COAF's notices, and which Class Counsel and defense counsel spent great effort coordinating with the present case.

The effort to forge a settlement that combined substantial cash <u>and</u> to compromise the Disputed Deficiency Balances (and the potential tax issues attendant thereto) <u>and</u> credit report relief proved to not be a simple feat. All of these complementary features added very substantial complexity (as evidenced by the multiple mediations) which a "litigation only" approach would not have had. It is also noteworthy that final approval does not end the complexities (or work) to be faced by Class Counsel. Inevitably, Class Counsel will deal with future communications from Class Members related to the issuance of 1099s (which will likely result in an *enormous* amount of additional time and effort) and the tax obligations relating thereto, the non-receipt of a settlement check, the reissuance of settlement checks for deceased class members, the credit report tradeline issues, etc.

### e.   The risk of nonpayment

Class Counsel undertook this action on an entirely contingent fee basis, assuming a <u>substantial risk</u> that counsel would have to devote a significant amount of time and incur expenses in prosecuting this action without any assurance of being compensated for the efforts or reimbursed for the costs incurred. Indeed, Class Counsel has not been compensated for any of his time or efforts since this matter was filed, while expending to date almost $50,000 for filing fees, mediation fees, experts, air travel, depositions, and other necessary expenditures. As recognized by this Court, where class counsel incurs thousands of dollars in costs and expenses while facing the risk of not being reimbursed[,] "[t]he risk of nonpayment...weighs in favor of granting the requested fee award." *Wallace*, 2015 WL 9268445 at *19. The Courts in this Circuit take into account that: "The petitioners prosecuted this case on a contingent fee basis. This risk is a factor to be considered in determining the fee....These hours were expended without any guarantee of success." *O'Rourke v. Healthdyne, Inc.* Civ. A. Nos, 84-4295, 84-4296, 1986 WL 923, at *2 (E.D. Pa. Jan. 16, 1986). This factor certainly counsels in favor of approving the requested attorney fee.

While Plaintiffs remain confident in the strength of their case, and of their ability to prove damages, this action (and indeed all litigation) involves substantial risks and the ultimate outcome cannot be predicted with certainty, particularly in a case such as this, which was novel in many ways. Accordingly, the risk of non-payment in this case weigh in favor of approving the fees sought in this Motion.

                3.      <u>Plaintiff's requested fee is an appropriate percentage of the recovery</u>

Plaintiffs submit that the most suitable analysis of the reasonableness of their requested attorney fee does not focus on only the cash portion of the benefit provided to the class by the Settlement, but on the totality of the wide-scoped benefits conferred.

After recognizing that because the case before it was a common fund case and the percentage of recovery method provided the most appropriate basis for evaluating class counsel's fee request, the court in *Cullen v. Whitman Medical Corporation*, 197 F.R.D. 136 (E.D. Pa. 2000) remarked, apropos to the present case: "The settlement fund in this case involves cash and forgiveness of debt. There is no question that the $5.97 million in cash is appropriately considered in determining the value of the settlement. The relevant issue is the appropriate value of the $1.3 million in loan forgiveness." *Id.* 147. Having thus framed the issue, the court concluded:

> Moreover, the fee sought by class counsel is based solely upon the cash and debt forgiveness and does not include the non-monetary benefits to the class. The non-monetary relief includes appointment of an ombudsman by the court and other remedial measures to provide future students with a better educational experience at UTS. Therefore, <u>I find it reasonable to include debt forgiveness in the total settlement value.</u>

*Id.* Emphasis added.

As stated above, the aggregate value of the settlement is approximately $38.6 million ($6.5 cash + $6.5 credit reparation + $25.4 debt forgiveness + $180,000 Post-Stay Payment Return). By this benchmark, Class Counsel fees requested represent approximately 6.7% of the aggregate value

(and 8.1% of the $31.9 million common fund cash plus Disputed Deficiency Balance extinguishment, without taking the credit reparation into account).

Furthermore, the fee agreement between Class Counsel Richard Shenkan and Shenkan Injury Lawyers, LLC. and each of the Representative Plaintiffs provides for a fee equal to 40% of the total benefit conferred upon the class.[12] Class Counsel, solely, incurred the entire risk of loss and has advanced, to date, $49,011.81 in this matter. Class Counsel is seeking a fee on his and his firm's behalf only for the work expended to date as well as the considerable services (i.e., particularly tax related matters) to be provided *in futuro* for the benefit of the class.

If one applies even a 20% rate to the common fund, the resulting attorney fee would exhaust the $6.5 million of cash in the settlement. Again, the attorney fee sought is only approximately 6.7% of the common fund, per *Cullen, supra.* plus the credit reparation. Plaintiffs believe that the request for an award of fees to Class Counsel in the sum of $2.6 million to be paid to Shenkan Injury Lawyers, LLC. is as fair and reasonable in light of all the relevant factors to be considered. Class Counsel is well-qualified to represent the Classes, having practiced as a civil litigator for twenty-two years and having served as class counsel in a variety of consumer class cases throughout Pennsylvania.

The fees represent approximately ***only 6.7%*** of the value of the Settlement, per *Cullen, supra.* This amount includes the significant work to be undertaken by Richard Shenkan and Shenkan Injury Lawyers, LLC. for the orderly administration of the settlement particularly the substantial time expected to be spent providing tax related information and resources in connection with the issuance of the 1099-Cs. "Under the percentage of recovery method, a court must first

---

[12]     *See, Edwards v. Alaska Pulp Corp.,* 920 P.2d 751, 758 n. 15 (Alaska 1996) (courts may consider, but should not be bound by the percentage in a contingency fee arrangement).

make a reasonable estimate the value of recovery made, including proposed fees, from which it can determine the relationship between the recovery and the attorneys' fees. Awards of between 20 to 30 percent are quite common." *Milkman, supra.*

## VII. CONCLUSION

For the reasons set forth above,[13] Plaintiffs respectfully request that this Court enter an Order, giving final approval to the Settlement Agreement, certifying the Class, awarding Plaintiffs the requested attorney fees and approving the reimbursement of counsel's expenses, and approving the requested service awards to the Representative Plaintiffs. A proposed order is attached as **Exhibit 4**.

Respectfully submitted,
SHENKAN INJURY LAWYERS, LLC.


By: Richard Shenkan
*Attorney for Plaintiffs*

11/1/19
Date

---

[13]    Class Counsel will be prepared to provide any supplemental information this Court requires to determine the reasonableness of any aspect of this Settlement. Detailed time records will be made available for an in-camera inspection upon the Court's request should it want to conduct a discretionary lodestar cross-check. This preserves the work product privilege in the event that the settlement is not approved. Plaintiff's counsel seeks a 6.7% percent of the common fund (as defined per *Cullen, supra.* together with the estimated value of the credit reparations) in an amount of $2.6M.

Class Counsel has devoted more than 1,000 hours relating to this litigation. Recently, the Eastern District of Pennsylvania has recently approved Richard Shenkan's hourly rate of $725 in *Mauthe v. Versa Cardio*, 5:16-CV-00570 (E.D. Pa. 2018); the Court of Common Pleas of Jefferson County, Pennsylvania also approved this hourly rate in *Maszgay, supra.*; see also, *Sobol v. Imprimis Pharmaceuticals, Inc.*, 16-CV 14339 (E.D. MI 2019)(also approving his hourly rate of $725).

## CERTIFICATION OF CONCURRENCE

I certify that the relief sought is Plaintiff's *Uncontested Motion for Final Approval of Settlement Agreement, Certification of Settlement Class, Approval of Attorney Fees and Costs, Entry of Final Judgment, and Dismissal with Prejudice* is uncontested.

SHENKAN INJURY LAWYERS, LLC.

By: Richard Shenkan
*Attorney for Plaintiffs*

11/1/19
Date

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was sent to all counsel of record on November 1, 2019 via the Court's electronic court filing system (ECF).

SHENKAN INJURY LAWYERS, LLC.

Richard Shenkan
*Attorney for Plaintiffs*

11/1/19
Date